[No. A064300. First Dist., Div. One. July 17, 1996.]

ARNTZ CONTRACTING COMPANY, et al., Cross-complainants, Cross-defendants and Appellants, v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Cross-defendant, Cross-complainant and Appellant.

[Opinion certified for partial publication.*]

*Certified for publication except as to part II of the Discussion. (Cal. Rules of Court, rules 976(b) and 976.1.)

470

**COUNSEL**

Howard, Rice, Nemerovski, Canady, Robertson, Falk & Rabkin, Jerome B. Falk, Jr., Steven L. Mayer, Therese M. Stewart, Pauline E. Calande, Miller Law Firm, R. W. Miller, Stephen R. Miller and Andrew C. Gately for Cross-complainants, Cross-defendants and Appellants.

Winston & Strawn, Dan K. Webb, Kimball R. Anderson, Musick, Peeler & Garrett, C. Donald McBride, Keker & Van Nest, John W. Keker and Gary M. Cohen for Cross-defendant, Cross-complainant and Appellant.

Crosby, Heafey, Roach & May, Peter W. Davis, Ezra Hendon and Valarie Mar as Amici Curiae.

## OPINION

**STRANKMAN, P. J.**—A general contractor was terminated from a public works construction project by the property owner who complained of deficient workmanship, and the surety that had issued performance and labor and material bonds on the project took over the project and completed construction using substitute contractors. In a lawsuit between the original general contractor and the surety, the surety recovered most of its completion costs and assorted expenses under the parties' indemnification agreements executed in connection with the bonds.

However, the contractor recovered against the surety upon claims of breach of contract in the surety's failure to honor a promise to bond future projects, and interference with prospective economic relations because the surety's termination of bonding and other acts frustrated the contractor's ability to secure bonding from other sureties. The surety's recovery on the indemnity agreements, after substantial offsets, was about $813,000. The contractor's recovery on its contract and tort actions was $16.5 million in compensatory damages, plus prejudgment interest and attorney fees and costs totaling about $8.4 million. The contractor was also awarded $100 million in punitive damages, but the trial court vacated the award. The contractor and surety both appeal.

We affirm the judgment in most particulars, but reverse the judgment as to the interference with prospective economic relations cause of action and strike the award of prejudgment interest based upon that tort claim. We also reverse the award to the contractor of attorney fees and costs and remand the case with directions to the trial court to determine the prevailing party on the separate contracts enforced in this litigation, rather than the prevailing party in the action as a whole, and to recalculate any recoverable fees, costs, and expenses accordingly.

### FACTS

In 1982, Arntz Contracting Company and related corporations and individuals (Arntz) contracted with the Richmond Housing Authority (the RHA) for the $4.6 million construction of Triangle Court Public Housing Project (Triangle Court). Because the project was a public work, Arntz had to post performance and labor and materials bonds to assure its faithful performance and payments to subcontractors and suppliers. St. Paul Fire and Marine Insurance Company (St. Paul) issued the Triangle Court bonds. Contractors generally have only one surety at a time, and St. Paul had issued bonds on Arntz projects since 1980. At the inception of the relationship between Arntz

and St. Paul, the parties executed industry standard indemnity agreements by which Arntz (both corporate entities and individuals) promised to indemnify St. Paul for all losses suffered "by reason of executing" the bonds.

The Triangle Court project was troubled from the start by underfunding, inadequate architectural drawings, and faulty subcontractor work. Various disputes erupted between Arntz and the RHA and, on November 5, 1984, the RHA terminated Arntz upon complaints of deficient work and demanded that St. Paul complete the project. St. Paul's claims department was alerted to the RHA's demand and established a file to monitor the Triangle Court problems. Arntz believed the termination wrongful and sued the RHA a few days later, the first strand in what was to become a web of litigation.

Arntz and St. Paul had a series of meetings to discuss Arntz's termination from the Triangle Court project, and Arntz claims that an oral promise by St. Paul to continue bonding it grew out of these negotiations. Thomas Arntz, the project manager of Triangle Court, testified that there was an informal meeting between the parties two days after Arntz's termination in which Arntz told St. Paul that it viewed the termination as wrongful and expressed its interest in doing whatever was necessary to preserve its good relationship with St. Paul because Arntz needed bonding to stay in business. No final agreement was reached at that meeting, but the parties reconvened on November 15.

By that time, St. Paul had advised Arntz's bond broker that all bonding was suspended. At the November 15 meeting, St. Paul announced that it would complete the project with a substitute contractor selected by putting the project "out to bid." Arntz objected because it wanted to maintain control of the project, and suggested that it be allowed to select a "friendly" substitute contractor. The parties also discussed Arntz's interest in maintaining a good relationship with St. Paul for bonding purposes. According to Thomas Arntz, St. Paul's representatives conferred among themselves and then announced it would permit Arntz to select the substitute contractor and continue bonding Arntz if Arntz posted $1 million in collateral, to which Arntz agreed. Thomas Arntz testified that the meeting concluded with St. Paul's assurance that the parties' bonding relationship would be "business as usual."

The parties met again on December 4, 1984, and bonding was discussed, among other matters. It was agreed that St. Paul would visit Arntz's office to audit its books for bonding, which it did the next day. Both parties were represented by counsel at the December 4 meeting, and Arntz's attorney

wrote a December 6 letter to St. Paul's attorney "to formalize the agreement" reached at the meeting. The letter recited that the parties agreed to a substitute contractor, that "Arntz would meet with representatives of St. Paul to re-establish an appropriate bond capacity for pending and future work," and that Arntz agreed to provide $1 million "in collateral as security for the actions set forth above."

On December 10, 1984, various contracts were executed by St. Paul, Arntz, and the substitute contractor, Cal Custom Construction Company (Cal Custom): St. Paul and Cal Custom signed a relet contract for completion of Triangle Court and Cal Custom and Arntz signed an agreement giving Arntz essential control of the project. The next day, St. Paul and Arntz executed the later disputed agreement in which Arntz pledged as collateral $1 million held in cash and securities accounts (Collateral Agreement).

St. Paul immediately resumed bonding Arntz with the issuance of a $2.3 million bid bond the day after the Collateral Agreement was executed. In early 1985, St. Paul wrote to Arntz confirming its "decision to continue to provide bonding on new projects." A St. Paul internal memorandum attaches a copy of that letter and states that "we have agreed to continue providing bonds to Arntz Contracting since coming to an agreement with them on the completion of [Triangle Court]."

At Triangle Court, there was little progress made in completing construction since Cal Custom was substituted for Arntz in late 1984 because all the parties became immersed in a dispute over the measures needed to correct deficient stucco and other work. In spring 1985, Arntz sued St. Paul and the RHA seeking a declaration that Cal Custom was not obligated to honor the RHA's demand for complete stucco removal and, in August 1985, obtained a temporary restraining order preventing stucco tear-off.

In addition to disputes over the proper scope of corrective work, Arntz also disputed St. Paul's entitlement to reimbursement for a Triangle Court consultant's fees. A St. Paul claims officer testified that Arntz's refusal to reimburse these expenses signaled trouble in the parties' indemnity arrangement. In July 1985, St. Paul refused to issue any future bonds unless Arntz paid all Triangle Court expenses. At first, Arntz continued to deny an obligation to pay the consultant's fees, but on September 6, 1985, capitulated to St. Paul's demand for reimbursement and sent a check for the consultant's fees to Arntz's bonding agent.

St. Paul never resumed bonding Arntz after the July 1985 termination. According to St. Paul, it would have considered bonding Arntz in early

September 1985 had Arntz reaffirmed an "iron-clad" commitment to pay all future expenses. But another event occurred that forestalled any such consideration. The RHA terminated St. Paul from Triangle Court and removed Cal Custom from the project on September 17, 1985, just a few days after the Arntz court order restraining stucco tear-off was dissolved. St. Paul blamed Arntz for the termination, claiming that it obstructed Cal Custom's completion of Triangle Court.

Arntz turned to other sureties for bonding. Arntz obtained limited bonding in 1986 from another surety company, but the relationship was soon terminated when that small company was acquired by a larger company that did not want to bond Arntz because Arntz was involved in a lawsuit with St. Paul. Arntz applied to a host of large, front line sureties but all declined to bond it. In applying for bonding, Arntz's bond broker completed a standard application form disclosing that Arntz was in litigation with St. Paul and had "defaulted so as to cause a loss" to St. Paul. The bond broker testified that the sureties denied bonding because Arntz was involved in a "lawsuit," "dispute," and "in claim with its surety." From 1986 through 1991, Arntz obtained only limited bonding from several small companies, "at pretty low levels of capacity."

Meanwhile, St. Paul had executed a second takeover contract with the RHA in August 1986 and Triangle Court was completed in late 1987 by another contractor retained by St. Paul. A settlement of the RHA's Triangle Court claims against Arntz and St. Paul, among other parties, was reached in late 1988.

In litigation between Arntz and St. Paul, St. Paul sought contractual indemnification for the costs of completing Triangle Court, costs of settlement with the RHA, and assorted other expenses. Arntz sought damages for breach of contract by St. Paul's failure to provide bonding, as allegedly promised with the Collateral Agreement, and in St. Paul's alleged interference with Arntz's prospective economic relations with other sureties. The parties stipulated to a three-phase trial in which St. Paul's claim for indemnity and the measure of indemnification were tried to the court in phases I and II and Arntz's breach of contract and tort claims were tried to a jury in phase III.[1]

St. Paul recovered indemnification in phases I and II, although not for all incurred expenses for which it sought payment. St. Paul's total recovery on

[1]Phase I also resolved Cal Custom's claim for rescission of its relet contract with St. Paul and St. Paul's claim for breach of that contract. In an earlier appeal, we affirmed judgment for Cal Custom upon substantial evidence that Cal Custom was entitled to rescission for mistakenly believing it was under no obligation to remove deficient stucco. (*Cal Custom Construction Co.* v. *St. Paul Fire & Marine Ins. Co.* (Apr. 18, 1995) A060944 [nonpub. opn.].)

the indemnity agreements, after substantial offsets, was about $813,000. In phase III, Arntz recovered $16.5 million in compensatory damages, plus prejudgment interest and attorney fees and costs from all phases of the trial totaling about $8.4 million. Arntz was also awarded $100 million in punitive damages, but the trial court vacated the award.

Arntz and St. Paul both appeal and have raised numerous issues in over 300 pages of briefs. In short, St. Paul asks us to affirm, but enlarge, its indemnification award and affirm the order vacating the award of punitive damages, but reverse the judgment on all other matters. Arntz asks us to reverse the order awarding St. Paul indemnification and reverse the order vacating the award of punitive damages, but otherwise affirm the judgment on all other matters.

We adopt neither position. We affirm the judgment in most particulars, but reverse the judgment as to the interference with prospective economic relations cause of action and strike the award of prejudgment interest based upon that tort claim. We also reverse Arntz's award of attorney fees and costs and remand the case for a recalculation. Our discussion of each of the issues raised by the parties follows.

## DISCUSSION

### I. Intentional Interference With Prospective Economic Relations

#### A. Elements of the Tort

St. Paul claims the evidence is insufficient to support the jury's verdict of intentional interference with prospective economic relations. We agree. The tort consists of the following elements: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." (*Youst* v. *Longo* (1987) 43 Cal.3d 64, 71, fn. 6 [233 Cal.Rptr. 294, 729 P.2d 728, 85 A.L.R.4th 1025].) St. Paul's primary assault is upon the third and fifth elements, as it claims there was no significant evidence that the disruption in Arntz's relations with other sureties resulted from any intentional acts by St. Paul designed to disrupt those relations.

Our Supreme Court has recently clarified that a defendant's culpable conduct is not established by simply showing intentional acts that

disrupted the plaintiff's prospective economic relations. (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 381-393 [45 Cal.Rptr.2d 436, 902 P.2d 740] (*Della Penna*).) "[A] plaintiff seeking to recover for an alleged interference with prospective contractual or economic relations must plead and prove as part of its case-in-chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." (*Id.* at p. 393.)

### B. Retroactive Application of Della Penna

 Arntz first argues that *Della Penna*, *supra*, 11 Cal.4th 376, does not apply here because we must measure the sufficiency of the evidence solely by the law as presented in the jury instructions, and *Della Penna*'s "wrong-fulness" standard was not included in the instructions. (*Null* v. *City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1534-1535 [254 Cal.Rptr. 492].) But *Null* held that adequacy of the evidence must be measured against the administered jury instructions because a civil litigant is obligated to propose complete instructions and may not withhold a theory from the jury, by tendering incomplete instructions, and then obtain appellate review of the evidence on a theory never presented to the jury. (*Ibid.*) Here, St. Paul did not fail to request instruction under *Della Penna*. *Della Penna* was not decided until October 1995, over two years after the jury reached its verdict, while this case was pending on appeal. (*Della Penna*, *supra*, at p. 376.)

Accordingly, the proper question is whether *Della Penna* has retroactive application. In *Della Penna* itself, our Supreme Court rejected the plaintiff's plea not to apply its pronouncements retroactively to a jury verdict rendered before the court's clarification. (*Della Penna*, *supra*, 11 Cal.4th at pp. 391-392, fn. 4.) As in *Della Penna*, no reason exists here to depart from the usual rule of retroactive application of judicial decisions, and Arntz suggests none. (*Ibid.*)

### C. The Wrongful Conduct Standard

In *Della Penna*, our Supreme Court held that a plaintiff prosecuting an interference with prospective economic relations claim must prove that the defendant engaged in wrongful conduct, but the court did not specify the precise scope of "wrongfulness." (*Della Penna*, *supra*, 11 Cal.4th at pp. 392-393.) The court did, however, approvingly discuss several cases from other states and from our intermediate appellate courts that have applied a "wrongfulness" standard. (*Id.* at pp. 385-387, 390-391.) Arntz relies upon

some of these cases in arguing that wrongfulness is established here because St. Paul acted with either improper motive or by improper means. This formulation of "wrongfulness" to encompass both motives and means does find support in many cases. (E.g., *Rickel* v. *Schwinn Bicycle Co.* (1983) 144 Cal.App.3d 648, 661 [192 Cal.Rptr. 732].) However, we agree with our Supreme Court's early pronouncement in the related area of intentional interference with contract: bad thoughts are no tort. (*Boyson* v. *Thorn* (1893) 98 Cal. 578, 584 [33 P. 492]; see *Della Penna, supra,* 11 Cal.4th at pp. 402-406 (conc. opn. of Mosk, J.).)[2] **(4)** Of course, a plaintiff must prove that the defendant intended to disrupt the plaintiff's prospective economic relations. But our focus for determining the *wrongfulness* of those intentional acts should be on the defendant's objective conduct, and evidence of motive or other subjective states of mind is relevant only to illuminating the nature of that conduct.[3] Thus, a defendant's intention to deceive is certainly relevant to proving wrongful misrepresentation, but a true representation does not become wrongful just because the defendant is motivated by a black desire to hurt plaintiff's business.

However, even a sharp focus upon wrongful means does not provide a clear picture of "wrongful conduct." Justice Mosk's concurring opinion in *Della Penna* advocates that proscribed conduct be limited to means that are independently tortious or a restraint of trade. (*Della Penna, supra,* 11 Cal.4th at pp. 408-410; see *San Francisco Design Center Associates* v. *Portman Companies* (1995) 41 Cal.App.4th 29, 40-45 [50 Cal.Rptr.2d 716] [competition privilege defeated by showing "wrongful means" defined as independently actionable conduct].) The Oregon Supreme Court suggests that conduct may be wrongful if it violates "a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." (*Top Serv. Body Shop, Inc.* v. *Allstate Ins. Co.* (1978) 283 Or. 201 [582 P.2d 1365, 1371], fn. omitted.) *Top Service Body Shop,*

---

[2] It bears emphasis that the torts of intentional interference with contract and intentional interference with prospective economic relations are distinct, even though related. (*Della Penna, supra,* 11 Cal.4th at p. 392.) While intentional interference with prospective economic relations requires proof of wrongful conduct beyond the fact of interference alone, our Supreme Court's first recognition of the tort of intentional interference with contract found that inducing breach of contract was itself wrongful conduct, and therefore actionable. (*Imperial Ice Co.* v. *Rossier* (1941) 18 Cal.2d 33, 38-39 [112 P.2d 631].) Accordingly, *Imperial Ice* disregarded *Boyson*'s broad statement that ". . . no interference with contractual relations is actionable if the means employed are otherwise lawful." (*Imperial Ice Co., supra,* at p. 38, citing *Boyson* v. *Thorn, supra,* 98 Cal. at p. 584.) But *Imperial Ice* reaffirmed *Boyson*'s principle that permissible conduct is not made actionable when done with "ill-will," "malice," or "bad intent." (*Imperial Ice Co., supra,* at p. 38.)

[3] Evidence of the defendant's subjective state of mind is also relevant to the separate issue of punitive damages. (Civ. Code, § 3294.)

*Inc.*'s recasting of the interference with prospective economic relations tort to require proof of "wrongfulness" was endorsed by our Supreme Court, but its suggested definition of "wrongfulness" was neither accepted nor rejected. (*Della Penna, supra*, at pp. 385, 393.) Our Supreme Court may later have occasion to clarify the meaning of "wrongful conduct" or "wrongfulness," or it may be that a precise definition proves impossible.

In the absence of a definitive statement from our high court, we believe guidance on the meaning of "wrongful conduct" is best derived from a review of earlier California cases that have applied a wrongfulness standard in assessing a defendant's alleged intentional interference with prospective economic relations. Two cases are relevant here. In *Rickel* v. *Schwinn Bicycle Co., supra*, the court found that a defendant manufacturer did not use wrongful means where the plaintiff dealer's proposed sale of its shop was disrupted by defendant's exercise of its contractual right to deny transfer to the prospective buyer and truthful statements to that prospective buyer that the manufacturer's business policy limited the grant of dealership rights. (144 Cal.App.3d at pp. 661-663.) Wrongful means were found in *Tri-Growth Centre City, Ltd.* v. *Silldorf, Burdman, Duignan & Eisenberg* (1989) 216 Cal.App.3d 1139, 1153-1154 [265 Cal.Rptr. 330], where defendant, a law firm, acted "out of the realm of legitimate business transactions" in allegedly breaching a fiduciary duty to its former clients by using confidential information to undercut the clients' real estate offer and acquire the property for itself. ▆▆▆ These cases are instructive here, since St. Paul claims it did no more than protect its contractual rights under its agreements with Arntz and truthfully report that contractual dispute to interested third parties. Arntz, on the other hand, claims St. Paul acted beyond the realm of its legitimate business interests and falsely reported the dispute to third parties.

## D. *Arntz's Claims of Wrongful Conduct*

Arntz's complaint against St. Paul is broadly based but ultimately rests upon claims that St. Paul intentionally interfered with Arntz's prospective economic relations with other sureties by (1) terminating its bonding of Arntz, (2) putting Arntz "in claim," and (3) sending false reports to St. Paul's reinsurers. We treat, and reject, these claims in turn.

Arntz's grievance with St. Paul's termination of bonding is a mosaic of varied pieces of discord. Arntz assails many of St. Paul's intermediate actions that culminated in the end of the parties' relationship, including St. Paul's insistence that the Triangle Court stucco be replaced as demanded by the RHA, and St. Paul's demand for immediate indemnification of the

project consultant's fees. But, fundamentally, Arntz complains that St. Paul terminated the parties' bonding relationship without good cause. Such a complaint sounds in contract, not tort. █ A contracting party's unjustified failure or refusal to perform is a breach of contract, and cannot be transmuted into tort liability by claiming that the breach detrimentally affected the promisee's business. (*Khoury* v. *Maly's of California, Inc.* (1993) 14 Cal.App.4th 612, 617-618 [17 Cal.Rptr.2d 708]; see *Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 513-514 [28 Cal.Rptr.2d 475, 869 P.2d 454] [a contracting party cannot be held tortiously liable for interfering with its own contract].)

█ The complaint that St. Paul interfered with Arntz's prospective economic relations by putting Arntz "in claim" is also infirm. St. Paul's regular business practice is to establish a claim file whenever an obligee makes a demand or claim under a performance bond. Once a contractor is "in claim," St. Paul's underwriters will not issue further performance bonds to the contractor without the claim department's approval. Here, St. Paul's claims department was brought in when the RHA terminated Arntz from the Triangle Court project in November 1984 and demanded that St. Paul complete the project. St. Paul did continue to bond Arntz, apparently with claims department approval, until July 1985, when St. Paul terminated bonding because Arntz refused to pay certain project expenses.

St. Paul's practice of putting a contractor "in claim" upon an obligee's demand under a performance bond is clearly not sufficient to constitute interference with Arntz's prospective economic relations. The practice is an internal operation and reasonably related to St. Paul's legitimate business interest in monitoring an obligee's claim and minimizing losses. But Arntz claims that the *effect* of being put "in claim" was to frustrate its efforts to secure bonding from other sureties. Arntz presented evidence that sureties routinely check a contractor's standing with its prior surety before issuing any bonds and that a contractor "in claim" is not given serious consideration for bonding by frontline sureties. But missing from the record is any evidence that a surety ever did contact St. Paul to inquire if Arntz was "in claim." Arntz concedes that there is "no direct evidence of any communications between St. Paul and the front line sureties from whom Arntz sought bonding after July 1985 . . . ." Nevertheless, Arntz says the jury was entitled to infer that such communications did occur, and that Arntz's "in claim" status was discussed. However, such an inference must be rejected since it is at odds with overwhelming direct evidence that the front line sureties declined to bond Arntz without ever contacting St. Paul, as soon as Arntz's broker told them at the time of application of the swirling controversy and litigation over the Triangle Court project.

In any event, no action for interference with prospective economic relations was established even if we assume that St. Paul told inquiring sureties that Arntz was "in claim," or proceeded to explain that Arntz was placed "in claim" because it was terminated from the Triangle Court project and refused to pay St. Paul for certain project expenses. As discussed above, the exercise of contractual rights (here, St. Paul's right to take over the project) and truthful statements to interested parties about one's standard business practices (here, putting Arntz "in claim") is not wrongful conduct actionable as intentional interference with prospective economic relations. (*Rickel* v. *Schwinn Bicycle Co.*, *supra*, 144 Cal.App.3d at pp. 661-663.)

On facts similar to those presented here, it has been held that a surety is not guilty of interfering with a contractor's prospective bonding relationship with other sureties where the surety does no more than truthfully report that the contractor has failed to complete a project and indemnify the surety. (*Wilcon, Inc.* v. *Travelers Indem. Co.* (5th Cir. 1981) 654 F.2d 976, 981-983.) Such information is never a secret, so the surety's disclosure breaches no confidentiality. (Cf. *Tri-Growth Centre City, Ltd.* v. *Silldorf, Burdman, Duignan & Eisenberg*, *supra*, 216 Cal.App.3d at pp. 1153-1154 [attorney's use of confidential information wrongful].) As Arntz's broker testified at trial, "any broker would have had to disclose the fact that Arntz was in claim with St. Paul[.]" Since Arntz's "in claim" status would necessarily be disclosed to prospective sureties, any truthful communications on the subject between those sureties and St. Paul did not injure Arntz. (See *Wilcon, Inc.*, *supra*, at pp. 982-983 [surety's disclosure of contractor's default and refusal to indemnify not proximate cause of interference with other sureties where disclosure probable from other source].)

Finally, Arntz argues that it did present evidence that St. Paul communicated false and misleading information to interested third parties, and points to St. Paul's periodic status reports to its reinsurers in which the Triangle Court litigation is described. Reinsurers share the surety's risk on performance bonds and St. Paul was obligated under its reinsurance treaties to advise its reinsurers of possible bond losses. Periodic status reports to reinsurers, such as those challenged here, are standard practice in the surety industry. Arntz does not contest St. Paul's right to send such reports to its reinsurers, but does contest the truthfulness of the content of those reports. Reduced to its essence, Arntz complains that the reports are misleading because they omit facts that would show Arntz's position in the dispute to be reasonable and unfairly characterize Arntz's conduct as interfering with completion of the project.

We have reviewed the status reports and find nothing actionable. A surety is not required to prepare reports to its reinsurers with assiduous objectivity.

These succinct reports are designed to advance the legitimate business objective of apprising reinsurers of potential losses on a bond, and need not present an exhaustive and charitable chronicle. Moreover, there is no evidence that these status reports contributed to Arntz's frustrations in finding another surety to bond its work. The reports were conveyed to St. Paul's reinsurers alone. Arntz argues that the jury could infer that some of the sureties that declined to bond Arntz did so because they had learned of the status reports from their reinsurers. But an inference requires some evidence to support it, and here there is none.

## II. *Breach of Contract**

. . . . . . . . . . . . . . . . . . . . . . . . . .

## III. *Indemnity*

In early phases of the trial, the court found that St. Paul was entitled to indemnity from Arntz for most, but not all, of the expenses incurred after taking over the Triangle Court project following Arntz's termination. St. Paul had spent roughly $4 million to complete the project after Arntz's termination, and it was awarded $2.7 million of that amount (before offsets). Both parties dispute this award, with St. Paul claiming entitlement to greater indemnity and Arntz claiming St. Paul was overindemnified. St. Paul also claims entitlement to indemnification for its settlement of litigation instituted by the RHA, the dissatisfied owner of Triangle Court. We conclude that the trial court properly fixed the extent of indemnification in all particulars.

### A. *Contractual Indemnification Provisions*

Indemnification is founded on express contractual provisions. Arntz executed a general agreement of indemnity (Indemnity Agreement) for the issuance of bonds on the Triangle Court project giving St. Paul the right "at its option and in its sole discretion to take possession of all or part of the work of [the project] whenever, in its sole opinion, such action is desirable or necessary, and at the expense of [Arntz] to complete, or to contract for the completion of same . . . ."[6] Further, St. Paul may "take such action as it might deem necessary or proper to obtain its release from any and all liability under the said bond or bonds, and [Arntz] further agree[s] that [it]

---

*See footnote *ante*, page 464.

[6]The Arntz individuals also executed third party indemnity agreements, which were attached to the Collateral Agreement discussed in the nonpublished portion of this opinion. There are no material differences in the indemnity provisions of these various agreements that warrant separate discussion.

shall further secure and indemnify [St. Paul] against any and all charges, liabilities, attorneys' fees and expenses of whatever nature which [St. Paul] may sustain or incur or be put to in obtaining such release." St. Paul is also expressly entitled to settle claims arising under the bonds and to manage completion of the project "for the purpose of minimizing any possible loss or ultimate loss" to it without incurring liability for those actions.

### B. *St. Paul's Complaint of Underindemnification of Takeover Expenses*

The trial court found that St. Paul was entitled to take over the Triangle Court project and recover for the expense of completing the project, except for those expenses incurred without a good faith belief that it was "desirable or necessary" to incur the expense. " ' "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." ' " (*Carma Developers (Cal.), Inc.* v. *Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371 [6 Cal.Rptr.2d 467, 826 P.2d 710] Here, St. Paul was given broad discretion in managing completion of the project, requiring its exercise of good faith. "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." (*Id.* at p. 372.)

Nothing in the Indemnity Agreement grants St. Paul unconditional power to incur expenses in completing the project, regardless of St. Paul's good faith belief in its actions. In fact, the contract specifies that St. Paul may take over and complete a project at Arntz's expense when "in its sole opinion, such action is *desirable or necessary*." That identical phrase has been held to require an examination as to whether the surety "in *good faith* believed it was either *desirable or necessary for it to take over the work in order to protect its interests as surety*." (*Seaboard Surety Company* v. *Dale Construction Co.* (1st Cir. 1956) 230 F.2d 625, 630, italics added; see *General Ins. Co. of America* v. *Singleton* (1974) 40 Cal.App.3d 439, 443-444 [115 Cal.Rptr. 291] [surety's settlement of claim indemnified where made in good faith].) St. Paul embraces this standard and both it and amicus curiae American Insurance Association acknowledge the general rule that a surety is not entitled to indemnification for any payments made fraudulently or without good faith. However, St. Paul claims the trial court did not consistently apply this standard and instead confused a surety's good faith obligation to its principal with the wholly different duty a liability insurer owes its insured.

The trial court was not confused. St. Paul rightly observes that a surety bond is not an insurance policy, and ". . . it is not the duty of the surety to

protect the principal as if the principal were an insured under an insurance policy." (*Schmitt* v. *Insurance Co. of North America* (1991) 230 Cal.App.3d 245, 258 [281 Cal.Rptr. 261]; see generally, Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1995) ¶ 6:1720 et seq., p. 6I-4.) But St. Paul wrongly denies the trial court's appreciation of this distinction. The court expressly stated that the standard it applied "was not the insurer/insured good faith standard, but the standard of good faith and fair conduct implied in every contract."[7]

St. Paul misunderstands the basis of the court's decision by unduly emphasizing a single sentence in the court's statements of decision that concerns the considerations attending a surety's initial takeover of a project. The court simply noted that a surety, in such a situation, must weigh the viability of competing claims and the consequences of its possible responses to those claims so that it can, in good faith, decide if it is "desirable or necessary" to take over the project to protect its interests. The court did not hold that a surety must compromise its interests to protect the interests of the principal. Reading the record as a whole, it is clear that the court applied the right standard in evaluating a surety's entitlement to expenses incurred following takeover of a bonded project.

In applying that legally correct standard, the court determined that St. Paul "did not have a good faith belief that it was 'desirable or necessary' to follow the directive of the RHA to completely remove and replace the stucco, sheet metal and roofing" and so disallowed indemnification for those expenses. St. Paul claims the determination that it lacked good faith cannot be sustained because it did not have an evil motive when incurring these expenses. But ". . . the covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive." (*Carma Developers (Cal.), Inc.* v. *Marathon Development California, Inc.,* supra, 2 Cal.4th at p. 373.) Here, the court found, on substantial evidence, that St. Paul incurred the stucco, sheet metal and roofing expenses despite being presented with overwhelming proof that those expenses were "unnecessary and unwarranted." St. Paul's authorization of those expenses was without "rational justification" and constituted "unreasonable economic waste." These findings are sufficient to support the trial court's conclusion that St. Paul did not in good faith believe it was either "desirable or necessary" to completely replace the stucco, sheet metal and roofing in order to protect its

[7]The court also stated that it never found St. Paul to have acted in "bad faith." Contrary to St. Paul's suggestion, this statement does not show the court wavering in its determination that St. Paul failed to meet the standard of good faith and fair dealing, but is yet additional proof that the court did not apply a liability insurer/insured bad faith standard, as a contextual reading of the statement makes manifest.

interests as surety, and so indemnification for those expenses was properly denied.

### C. *Arntz's Complaint of Overindemnification of Takeover Expenses*

As mentioned above, the trial court awarded St. Paul $2.7 million of the roughly $4 million spent in completing the project. The court, having found that St. Paul acted in good faith in taking over the project, calculated the amount of indemnification by including "those costs and expenses that would have been incurred and payments that would have been made as a result of its good faith acts" to complete the project. This methodology eliminated compensation for the expense of stucco, sheet metal and roofing work that St. Paul obligated itself to undertake without a good faith belief that such construction was "desirable or necessary." Arntz argues that *all* indemnification of St. Paul's takeover expenses should have been denied because St. Paul's initial good faith in taking over the project was abrogated by its later want of good faith, and St. Paul effectively volunteered to assume the takeover expenses by not categorically denying the RHA's unreasonable demands for work outside the original construction contract.

Arntz is wrong. As already explained, St. Paul took over the project in good faith and is entitled under the Indemnity Agreement to indemnification for all expenses incurred in completing the project, subject only to the exclusion of expenses from work that was not undertaken in good faith. St. Paul was not a "volunteer," but was compelled to complete the project as the surety of Arntz's performance. Arntz's claim that St. Paul volunteered to complete the project rests on its assertion that the construction contract's performance was excused by the RHA's unreasonable demand for corrective work. Arntz characterizes a rhetorical statement by the court that St. Paul "may not even have been obligated to complete the project" as a "suggestion" and then dresses it as a hard fact. But the trial court made no such factual finding. Instead, the court found that St. Paul acted in good faith in determining it "desirable or necessary" to take over the project and complete it. Indemnification was properly awarded.

### D. *Settlement of the RHA Litigation*

In late 1988, a settlement was reached in litigation over Triangle Court by which the RHA released all claims against Arntz and St. Paul, among others. St. Paul, while asserting Arntz ultimately liable for the settlement cost, agreed that the RHA could retain $500,000 from amounts St. Paul was claiming under the construction contract. Arntz's insurers paid the RHA $250,000.

The trial court ruled that St. Paul was not entitled to indemnification for the settlement. The court found that the settled claims were direct claims against St. Paul for its own alleged misconduct in handling the RHA's grievances and managing the project and were not claims that arose under the bonds it had issued to Arntz. The court concluded that St. Paul's settlement "was a settlement for its own benefit only and did not relate in any way to acts or breaches by Arntz." The court also found that the construction contract payments waived by St. Paul to settle the litigation were for extra work unreasonably undertaken in cynical reliance on a "blank check" of indemnification from Arntz. Therefore, permitting indemnification of the settlement payment would circumvent the court's denial of indemnification for construction completion expenses for which St. Paul had no good faith belief that the work was either "desirable or necessary." The court found these reasons sufficient in themselves to preclude indemnification, but later explained that they also supported its conclusion that the settlement was not made in good faith.

■ A surety is not entitled to indemnification for amounts paid in settlement of claims upon its bonds if the settlement is not made in good faith. (*General Ins. Co. of America* v. *Singleton, supra,* 40 Cal.App.3d at pp. 443-444.) Nor is one entitled to indemnification for settling claims that allege the indemnitee's independent liability, outside the coverage terms of the indemnity agreement. (*Byron Jackson Co.* v. *Woods* (1940) 41 Cal.App.2d 777, 781 [107 P.2d 639]; see *Peter Culley & Associates* v. *Superior Court* (1992) 10 Cal.App.4th 1484, 1497 [13 Cal.Rptr.2d 624] [upon settlement, indemnitee must prove liability is covered by the contract].) ■ Here, the court found that the settlement compensated the RHA for St. Paul's own alleged misconduct, unrelated to Arntz's performance under the bond, and that such misconduct was outside the Indemnity Agreement's coverage.

The question presented is a difficult one: may a surety recover the cost of settling litigation brought against both it and its principal that alleges the surety's own wrongdoing? We are convinced that an obligee's bare allegation of surety bad faith, or other misdeeds, is not alone sufficient to defeat a surety's right to be indemnified by its principal. Such allegations are easily made, and may be based on nothing more that an obligee's interest in frightening a surety into settling the obligee's claims on the principal's bond. A surety that acts to protect itself by settling litigation containing an obligee's allegations of surety bad faith does not admit the truth of those allegations, nor does the surety's self-interested settlement alone demonstrate bad faith with its principal. ■ A surety's exposure to its obligees'

bad faith claim may be a reasonable ground for settling bond litigation that will not preclude indemnification. (See *U.S. for Use of I.B.E.W.* v. *United Pacific Ins.* (D. Idaho 1988) 697 F.Supp. 378, 379-382 [indemnification awarded, but issue not squarely addressed].) It is certainly true that indemnification is not precluded just because a surety is motivated to settle a case "for its own benefit." (*U.S. Fidelity Co.* v. *Sandoval* (1912) 223 U.S. 227, 232 [56 L.Ed. 415, 418, 32 S.Ct. 298] [surety indemnified for payment made to state obligee upon state's threat to revoke surety's business license if payment refused]; *Fidelity & Dep. Co. of Maryland* v. *Bristol Steel* (4th Cir. 1983) 722 F.2d 1160, 1164-1165 [surety indemnified for payment made to state agency obligee to regain agency's business].)

■ However, the trial court found that the situation here went beyond a bare, collateral allegation of surety wrongdoing in processing claims against the principal. St. Paul was charged with bad faith insurance practices for failing to promptly investigate and process the RHA's claims. But the RHA also sued St. Paul for its independent management of the project after the takeover, alleging, among other things, that St. Paul failed to timely perform work and maintain a construction progress schedule. The RHA also alleged that St. Paul misrepresented its intentions to replace the stucco, sheet metal and roofing systems and performed deficiently in completing construction.

We accept St. Paul's argument that it would not have taken over management of the project but for the Arntz bond, but we cannot accept the further proposition that a surety's every subsequent act in managing the project arises under the bond and immunizes the surety from personal accountability. The parties could not have intended such an absurd result and, indeed, the Indemnity Agreement expressly states that Arntz does not discharge St. Paul's liability for "deliberate and wilful malfeasance" in managing the project. We conclude that indemnification of settlement costs is properly denied where, as here, the costs are attributable to an obligee's direct action against the surety containing colorable allegations that the surety's deliberate and wilful malfeasance in managing the project damaged the obligee and the trier of fact finds, upon substantial evidence, that the alleged malfeasance and resulting damages are unrelated to any wrongdoing by the principal.

IV. *Introduction in Phase III of Phases I and II Findings*

The parties stipulated to a three-phase trial in which St. Paul's claim for indemnity and the measure of indemnification were tried to the court in phases I and II and Arntz's breach of contract and tort claims were tried to

a jury in phase III. After concluding the early phases, the court asked the parties to prepare a statement of the case to be read to the jury in phase III. The parties submitted argumentative statements that presented skewed accounts of the case and the court's findings in the earlier trial phases. The court proposed its own statement of the case which generated unending debate, so the court urged the parties to prepare a joint statement. The parties failed to reach an accord. The court decided to read to the jury its slightly modified statements of decision from the earlier trial phases, and the jury was instructed to accept as true the facts previously determined to the extent they proved relevant to the issues before it.

St. Paul declares that the court "usurped the province of the jury" by removing material issues of fact from its consideration. According to St. Paul, the court should not have advised the jury of its earlier findings at all. St. Paul also faults the court for reading particular, assertedly prejudicial portions of the statements of decision.

St. Paul's extreme assault attacking *any* introduction of the court's earlier findings is unfounded in law and inconsistent with its position in the trial court. Issues adjudicated in earlier phases of a bifurcated trial are binding in later phases of that trial and need not be relitigated. (See *Golden West Baseball Co.* v. *City of Anaheim* (1994) 25 Cal.App.4th 11, 50 [31 Cal.Rptr.2d 378] [bench resolution of bifurcated equitable issues eliminated need for a second phase jury trial on legal issues]; *Estate of Kennedy* (1982) 135 Cal.App.3d 676, 682-683 [185 Cal.Rptr. 540] [bench resolution of bifurcated legal issues eliminated need for second phase jury trial on factual issues].) No other rule is possible, or bifurcation of trial issues would create duplication, thus subverting the procedure's goal of efficiency. (Code Civ. Proc., § 598.) "[D]uplication of effort is the very opposite of the purpose of bifurcated trials." (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 888 [92 Cal.Rptr. 162, 479 P.2d 362].)

We reject St. Paul's absurd, circular argument on appeal that a bifurcated trial adjudication is binding in later phases only if the adjudication is res judicata, which it never can be because no final judgment is entered between trial phases. We also note that the argument contrasts with St. Paul's position in its *in limine* motion where it urged the court to advise the jury of its indemnity decision in the statement of the case and jury instructions, and even proposed as a model a case that founded jury instructions upon the court's statement of decision from an earlier phase of the trial. (*Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 736 [15 Cal.Rptr.2d

815].) St. Paul's trial argument amounts to an acknowledgment that adjudicated issues in earlier phases of a bifurcated trial are binding in later phases of trial.

As an alternative to its blanket challenge to any introduction of the court's earlier findings, St. Paul argues that the court erred here by reading its statements of decision to the jury because they contained irrelevant, misleading and prejudicial evidence. While we do not endorse the wholesale introduction of statements of decision from one phase of a bifurcated trial into another trial phase, we discern no error here. Preliminarily, we observe that the trial court gave the parties every opportunity to prepare an objective statement of the case but they stubbornly clung to self-serving accounts. The court was entitled to prepare its own statement of the case and craft it from its statements of decision which had already passed through the crucible of the parties' objections and proposed modifications.

Any error in reading *particular* portions of the court's statements of decision must be demonstrated to have prejudiced St. Paul's case. St. Paul focuses its complaint of prejudice upon the court's statement to the jury that the "collateral agreement was required by St. Paul as a condition to allowing Arntz to direct the completion of the project through Cal Custom. It was also *executed by Arntz to protect its bonding capacity* which was a principal concern of Arntz." (Italics added.) St. Paul claims this statement deprived it of an opportunity to defend the breach of contract claim with proof that the Collateral Agreement did not include a promise of future bonding but was executed solely to allow Arntz's selection of Cal Custom as the substitute contractor. This summation of Arntz's *unilateral motivation* for executing the Collateral Agreement was not a conclusion that the Collateral Agreement included a *mutually agreed term* of future bonding. Moreover, the jury was presented with overwhelming evidence that Arntz's motivation in executing the Collateral Agreement was, indeed, to preserve its bonding relationship with St. Paul. It is not reasonably probable that, had this portion of the statements of decision not been read, St. Paul would have attained a more favorable result. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], cert. den. (1957) 355 U.S. 846 [2 L.Ed.2d 55, 78 S.Ct. 70].)

V. *Denial of Motion for Trial Continuance*

St. Paul claims the trial court abused its discretion in denying St. Paul's motion for a trial continuance when its nonparty surety underwriting expert suffered a stroke shortly before trial and was unable to testify. On

rulings upon motions for continuances, we defer to the sound discretion of the trial court and will not disturb its ruling absent a clear showing that it abused its discretion. (*Foster* v. *Civil Service Com.* (1983) 142 Cal.App.3d 444, 448 [190 Cal.Rptr. 893].) We find no abuse of discretion here. The expert's deposition testimony was available for use at trial, a former party witness testified competently as to surety practices, and the court forbade Arntz from commenting to the jury about the absence of a nonparty surety expert witness. The trial court acted well within the bounds of reason in denying St. Paul's request for an open-ended continuance of trial.

## VI. *Compensatory Damages*

The jury awarded Arntz $16.5 million for damages caused by St. Paul's breach of the Collateral Agreement. The amount of damages was supported by Arntz's expert witnesses, who calculated lost profits at $15.8 to $18.8 million. St. Paul contends that damages for lost bonding capacity is inherently speculative and that this damages award is not supported by substantial evidence because it is founded on flawed assumptions.

As to the first point, lost profit from impaired bonding capacity is recoverable in a proper case, and is not inherently speculative. (*S.C. Anderson, Inc.* v. *Bank of America* (1994) 24 Cal.App.4th 529, 534 [30 Cal.Rptr.2d 286]; see *Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285, 301 [85 Cal.Rptr. 444, 466 P.2d 996].) No court has adopted St. Paul's position that damages for lost bonding capacity can be established only with proof of "specific, identified construction projects that the contractor had prepared bids on, but was precluded from submitting because of an inability to obtain bid bonds." Contrary to St. Paul's argument, such a rule finds no voice in *S.C. Anderson, Inc.*, which expressly declined to address the subject. (See *S.C. Anderson, Inc.*, *supra*, at p. 537, fn. 9.) To adopt and enforce St. Paul's proposed rule on these facts would be absurd. The jury found that St. Paul breached a contract to provide bonding to Arntz and Arntz proved that its limited bonding prevented it from even bidding on many construction projects. Requiring Arntz to prepare detailed bids it could never submit would compel a senseless waste of time and provide no surer safeguard against speculative damages.

As to the reasonableness of the assumptions underlying the experts' lost profit analysis, criticisms of an expert's method of calculation is a matter for the jury's consideration in weighing that evidence. (*Brandon & Tibbs* v. *George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 469 [277

Cal.Rptr. 40].) "It is for the trier of fact to accept or reject this evidence, and this evidence not being inherently improbable provides a substantial basis for the trial court's award of lost profits . . . ." (*Id.* at pp. 469-470.) We have reviewed the evidence and find nothing unreliable or "inherently improbable" in the experts' method of calculation.

VII. *Attorney Fees and Costs*

The trial court awarded Arntz attorney fees of about $1.7 million and litigation costs of almost $1 million. Arntz recovered its fees and costs under reciprocal application of the provisions of the Indemnity Agreement and third party indemnity agreements that entitled St. Paul to recover "costs, charges and expenses, including attorneys' fees" incurred in enforcing the contract. The Indemnity Agreement and third party indemnity agreements were successfully enforced by St. Paul in phases I and II where St. Paul recovered costs of project completion, bond and insurance expenses, and costs and expenses incurred under its labor and materials bond in an amount totaling about $813,000, after allowable offsets. The Collateral Agreement, which incorporated the third party indemnity agreements, was successfully enforced by Arntz in phase III where Arntz recovered lost profits of $16.5 million caused by St. Paul's breach of its promise to provide bonding. The court awarded Arntz its fees and costs from all three phases of the trial, finding Arntz to be the "prevailing party in this consolidated litigation" given its "net recovery." (Civ. Code, § 1717.) In calculating costs, the court found that the contractual provisions authorized a broad award of litigation expenses more expansive than the limited statutory costs routinely recoverable by a prevailing party. (Code Civ. Proc., §§ 1032, 1033.5.)

St. Paul claims the court erred in determining the prevailing party by reference to the net outcome of all trial phases because the "party prevailing *on the contract*" is entitled to fees under Civil Code section 1717 and the trial phases concerned separate contracts with different victors. St. Paul is correct. Phases I and II concerned the general Indemnity Agreement and the third party indemnity agreements, whereas phase III concerned the Collateral Agreement. The indemnity agreements and Collateral Agreement are separate and cannot, as Arntz suggests, be read as a single contract. The 1984 Collateral Agreement's incorporation of the 1980 third party indemnity agreements did not destroy the independence of the third party indemnity agreements and merge them into a single contract with the Collateral Agreement. Contractual incorporation simply includes terms that are set forth in another document and saves the labor of copying those document terms

verbatim. Incorporation by reference makes the referenced document (third party indemnity agreements) part of the contract (Collateral Agreement), but it does not make the new contract (Collateral Agreement) part of the existing document (third party indemnity agreements).[8]

When an action involves multiple, independent contracts, each of which provides for attorney fees, the prevailing party for purposes of Civil Code section 1717 must be determined as to each contract regardless of who prevails in the overall action. (*Hunt* v. *Fahnestock* (1990) 220 Cal.App.3d 628, 630 [269 Cal.Rptr. 614].) The fact that a party "obtained a higher net recovery in the lawsuit is irrelevant to the determination of which party prevailed on any particular action on a contract." (*Myers Building Industries, Ltd.* v. *Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 975, fn. 21 [17 Cal.Rptr.2d 242].) The trial court misunderstood its obligation to determine the prevailing party on the contract, rather than in the entire action that concerned independent contracts. Accordingly, we must remand the matter for a determination of the prevailing party on the Indemnity Agreement and third party indemnity agreements litigated in Phases I and II, and the prevailing party on the Collateral Agreement litigated in Phase III. Any fees awarded to St. Paul under the indemnity agreements may be deducted by the court from the damages awarded to Arntz under the Collateral Agreement. (Civ. Code, § 1717, subd. (c).)

To provide complete resolution of related issues and greater guidance on remand, we also address St. Paul's remaining challenges to the cost award. First, St. Paul claims the court should have limited recoverable costs to the prescribed statutory costs routinely recoverable by a prevailing party. (Code Civ. Proc., §§ 1032, 1033.) We recognize there is authority holding that an undefined general contractual provision entitling the prevailing party to "reasonable attorney's fees and costs" must be interpreted in light of Code of Civil Procedure section 1033.5's limited definition of costs. (*Ripley* v. *Pappadopoulos* (1994) 23 Cal.App.4th 1616, 1621-1627 [28 Cal.Rptr.2d 878]; cf. *Bussey* v. *Affleck* (1990) 225 Cal.App.3d 1162, 1166 [275 Cal.Rptr. 646] [some attorney disbursements recoverable as attorney fees].) However, *Ripley* expressly declined to address the situation of a broad contractual cost provision where litigation expenses are specially pleaded and proven at trial. (*Ripley*, *supra*, at p. 1627, fn. 18.) That situation is presented here, since the

---

[8] The Collateral Agreement's incorporation of the third party indemnity agreements effectively incorporated the indemnity agreements' fee provision, thus defeating St. Paul's subsidiary argument that fees are not recoverable under the Collateral Agreement because it contains no fee provision. (*Republic Bank* v. *Marine Nat. Bank* (1996) 45 Cal.App.4th 919, 922-925 [53 Cal.Rptr.2d 90].)

contracts authorize recovery of all "costs, charges and expenses" and litigation expenses were pleaded and proven pursuant to a procedure stipulated by the parties. While it is reasonable to interpret a general contractual cost provision by reference to an established statutory definition of costs, we do not discern any legislative intent to prevent sophisticated parties from freely choosing a broader standard authorizing recovery of reasonable litigation charges and expenses.

As a second point, St. Paul claims that Civil Code section 1717 relates to attorney fees alone, so that a contractual cost provision authorizing one party's recovery of litigation expenses beyond statutory costs benefits that party alone, and is not a reciprocal right. Civil Code section 1717, subdivision (a) states: "where the contract specifically provides [that] attorney's fees and costs . . . shall be awarded either to one of the parties or to the prevailing party," then the prevailing party "shall be entitled to reasonable attorney's fees in addition to other costs" whether or not he or she is the party specified in the contract. We are satisfied that the Legislature's express reference to "attorney's fees *and costs*" makes contractual provisions reciprocal as to both fees and costs. Any other interpretation would render the costs reference surplusage.

## VIII. *Prejudgment Interest*

Arntz was awarded about $5.7 million in prejudgment interest on its tort claim of interference with prospective economic relations. (Civ. Code, § 3288.) The award is vacated since we are setting aside the tort verdict upon which it rests. Arntz argues that we should sustain the prejudgment interest award on another basis, as an award on the unliquidated contract claim. (Civ. Code, § 3287, subd. (b).) But the trial court thoroughly considered this matter and denied Arntz's request for prejudgment interest on the contract verdict. The ruling was a proper exercise of the court's broad discretion in this arena and will not be disturbed. (See *Moreno* v. *Jessup Buena Vista Dairy* (1975) 50 Cal.App.3d 438, 448 [123 Cal.Rptr. 393] [upholding denial of prejudgment interest].)

## IX. *Punitive Damages*

The jury's award of $100 million in punitive damages was found to be unsupported by the evidence and vacated by the trial court. That finding is assailed by Arntz, but we need not address the matter since we are setting aside the underlying tort claim.

## Disposition

The judgment is reversed as to the interference with prospective economic relations cause of action and the trial court is directed to enter judgment in favor of St. Paul on that claim. The award of prejudgment interest, based upon that tort claim, is stricken. The award to Arntz of attorney fees and litigation costs and expenses is reversed and the trial court is directed to determine the prevailing party on the separate contracts enforced in this litigation and to calculate any recoverable fees, costs, and expenses accordingly. The judgment is otherwise affirmed. All parties shall bear their own attorney fees, costs, and expenses on appeal.

Stein, J., and Dossee, J., concurred.

A petition for a rehearing was denied August 9, 1996.